IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

FILED BY _MC_ D.C.

JUN 1 3 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

GUILLERMO JOSÉ ZÁRRAGA LÁZARO;

Plaintiff,

v.

NICOLÁS MADURO MOROS; IVÁN HERNÁNDEZ DALA; TARECK
ZAIDAN EL AISSAMI MADDAH;  PETRÓLEOS DE VENEZUELA, S.A.
(PDVSA); and  JOHN DOES 1-10,

Defendants.

_____/

Case No. _____

**COMMPLAINT *(Jury Trial Demanded)***

**Introduction and Nature of the Action**

1. This is a civil action for damages arising from the unlawful abduction, firing, and harassment of Plaintiff **Guillermo José Zárraga Lázaro** ("Zárraga"), an engineer and union leader of Venezuela's state oil company Petróleos de Venezuela, S.A. (PDVSA), by agents of the regime of **Nicolás Maduro Moros**. In late 2019 and 2020, Zárraga was targeted on false accusations of espionage and terrorism due to his perceived connection with a detained U.S. ex-Marine, Matthew John Heath, in what Venezuelan authorities dubbed the "American Spy" case. A Civil Case of *Heath v. Maduro et al.* has been filed in this Court. Zárraga was kidnapped from his home in the pre-dawn hours by armed security agents, **tortured** into coerced confessions, and arbitrarily detained for over three years without a fair trial. Throughout this ordeal, Zárraga's wife (Potential Plaintiff **Jane Doe**) and teenage daughter (Potential Plaintiff **A.Z.**) suffered extreme fear, anguish, and intimidation as armed agents held them at gunpoint during the abduction and later threatened harm to them in order to break Zárraga's will. Plaintiffs seek justice for these egregious violations of international law, fundamental human rights, and U.S. and state law, and they demand full compensatory and punitive damages to redress their injuries.

2. **Defendants**

3. The Defendants are those responsible for orchestrating and carrying out this campaign of persecution against Zárraga. Specifically:

4. **Nicolás Maduro Moros ("Maduro")** – the de facto President of Venezuela who, along with a coterie of high-ranking officials, operates a repressive criminal enterprise to maintain power through a pattern of terrorism, drug trafficking, violent human-rights abuses, and corruption.

5. **Iván Hernández Dala** – at all relevant times, the commander of Venezuela's General Directorate of Military Counterintelligence (DGCIM), the agency whose agents kidnapped and tortured Zárraga.

6. **Tareck Zaidan El Aissami Maddah ("El Aissami")** – a high-ranking official (formerly Minister of Petroleum and Economic Vice-President) who, according to eyewitness accounts, personally ordered Zárraga's abduction in 2020 as part of a fabricated conspiracy case.

7. **Petróleos de Venezuela, S.A. (PDVSA)** – the Venezuelan state-owned oil company that employed Zárraga for decades and, acting through its security personnel and management aligned with the Maduro regime, participated in the abduction of Zarraga and by retaliating against him (including an unlawful firing and workplace harassment) due to his union activities and perceived disloyalty.

8. **PDVSA Ad Hoc Administrative Board** – the ad hoc board of PDVSA recognized by the United States and other countries since 2019 as the legitimate authority over PDVSA's assets abroad (including PDVSA's American subsidiary, CITGO). The PDVSA Ad Hoc Board is named in theses proceedings  solely to ensure that PDVSA as an entity is properly before this Court and bound by any judgment; Plaintiff does not allege that the Ad Hoc Board members themselves perpetrated the wrongful acts.

9. **John Does 1–10** – the DGCIM agents, PDVSA security officers, and other persons who directly carried out the home raid, torture sessions, and other acts against Plaintiffs, whose true names are not yet known to Plaintiffs.

10. All Defendants are sued in their personal capacities for their unlawful acts and, to the extent applicable, in their official capacities as agents of the Venezuelan state.

11. **Jurisdiction and Venue**

12. **Subject-Matter Jurisdiction:** This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff asserts claims arising under federal statutes – including the **Alien Tort Statute (ATS)**, 28 U.S.C. § 1350; the **Torture Victim Protection Act of 1991 (TVPA)**, Pub. L. 102-256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note); and the **Racketeer Influenced and Corrupt**

**Organizations Act (RICO)**, 18 U.S.C. § 1961 *et seq.* – as well as claims under customary international law incorporated through federal common law. The Court also has jurisdiction under 28 U.S.C. § 1332 (diversity) and § 1367 (supplemental jurisdiction) to the extent Plaintiffs assert state-law causes of action (including under Florida statutory and common law) in conjunction with the federal claims.

13. **Foreign Sovereign Immunity Not Applicable:** To the extent any Defendant is a "foreign state" or an agency/instrumentality thereof under the **Foreign Sovereign Immunities Act (FSIA)**, 28 U.S.C. § 1602 *et seq.*, one or more exceptions to sovereign immunity apply, giving this Court subject-matter jurisdiction under 28 U.S.C. § 1330. First, the **commercial activity exception** (28 U.S.C. § 1605(a)(2)) applies to PDVSA's conduct: this action is based upon acts outside the United States in connection with PDVSA's commercial activities (its employment and labor relations with Plaintiff Zárraga in the operation of a global oil enterprise), and those acts caused a direct effect in the United States. In particular, Defendants falsely accused Zárraga of compromising U.S.-based PDVSA assets (the CITGO refineries) and tied their actions to the protection of those U.S. assets; Zárraga's ensuing exile from Venezuela  and asylum seeking process in the United States is a direct result of Defendants' actions. Second, Defendants' conduct falls under the **non-commercial tort exception**, 28 U.S.C. § 1605(a)(5), because it includes personal injury and property loss (e.g. the loss

of Zárraga's employment and wages) caused by the tortious acts of foreign officials. Although those torts were largely committed abroad, they were part of a scheme that included substantial acts in the United States – notably, the Maduro regime's fundraising through narcotics trafficking and money laundering in Florida to finance its repressive apparatus, and the use of the "American Spy" narrative (involving alleged threats to U.S. interests) to justify the crackdowns. In addition, the **terrorism exception** (28 U.S.C. § 1605A) underscores Congress's intent to deny immunity for foreign state actors who commit torture, extrajudicial killing, or hostage-taking. (Venezuela is not currently designated by the U.S. as a state sponsor of terrorism; however, the U.S. Department of Justice has charged Maduro and his top lieutenants with operating a "narco-terrorism partnership" with the FARC for two decades, conduct that was not legitimate statecraft but criminal activity outside any lawful authority.) Given the nature of Defendants' offenses – including torture and hostage-taking of an innocent civilian – and the fact that the legitimate Venezuelan governing authorities recognized by the U.S. have not asserted immunity on their behalf, Defendants are not entitled to sovereign immunity in this case. Furthermore, to the extent an explicit waiver is required, Plaintiffs assert that Venezuela's engagement in prisoner-exchange negotiations and international accords (such as the 2023 Barbados Agreement that secured Zárraga's release) constitutes an **implied waiver** of immunity for claims by the victims of the

very human rights abuses addressed in those agreements. Finally, the individual Defendants sued in their personal capacities (e.g. Maduro, Hernández Dala, El Aissami) are not protected by the FSIA at all, and any claim of common-law foreign official immunity is unwarranted because their actions – torture, arbitrary detention, and narco-terrorism – were **ultra vires**, taken for personal advantage and to perpetuate an unlawful regime, rather than legitimate official acts.

14. **Venue:** Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(3) and (f). A substantial part of the events or omissions giving rise to the claim occurred in this District, and/or a substantial part of Defendants' property or assets is situated in this District. Defendants and their co-conspirators have engaged in significant activities in South Florida in furtherance of the wrongful acts – including laundering illicit funds through Florida banks and real estate, trafficking cocaine into Florida, and even committing predicate acts of the enterprise (such as extortion and kidnapping plots) on U.S. soil. Additionally, one or more Plaintiffs have resided in this District since fleeing Venezuela, and they have experienced the effects of Defendants' actions here (such as ongoing emotional distress and reputational harm). Venue is also proper under 18 U.S.C. § 1965(a) (RICO's venue provision) because Defendants conducted their illicit affairs in this District.

15. **Parties**

16. **Plaintiff Guillermo José Zárraga Lázaro ("Zárraga")** is a 59-year-old Venezuelan citizen who, at times material to this case, was employed by PDVSA and served as an elected officer of the oil workers' union in Falcón State, Venezuela. After enduring the unlawful detention and torture described herein, Zárraga fled Venezuela in late 2023 to avoid a politically motivated conviction, and he reunited with family abroad. He and his immediate family are to relocate in the United States (within this District) as asylum-seekers or other lawful residents.

17. **Plaintiff Jane Doe** is Zárraga's wife and the grand mother of Plaintiff A.Z. She is a Venezuelan citizen who was present during the home raid and suffered at the hands of Defendants as described. She also fled Venezuela and now resides with Zárraga in the United States.

18. **Plaintiff A.Z.** is the grand daughter of Zárraga and Jane Doe, who was 15 years old at the time of the events in question. She likewise resettled outside Venezuela and now lives by herself in the United States. All Plaintiffs bring this action on their own behalf to recover for their personal injuries. In addition, to the extent permitted by law, they act as representatives of the estate of Zárraga's late father (who died while Zárraga was imprisoned) and on behalf of any other close family members who suffered derivative harm (such as emotional distress and loss of consortium) as a result of Defendants' conduct.

19. **Preservation of Rights for Similarly Situated Victims:** Plaintiffs allege on information and belief that Defendants' conduct toward Zárraga was not an isolated incident, but part of a broader pattern of repression targeting numerous perceived dissidents, whistleblowers, and innocent citizens under similar false pretenses. Dozens of other Venezuelan victims – including oil industry professionals, union leaders, political opponents, and even family members of regime critics – have been subjected to arbitrary detention, torture, and cruel treatment by the Maduro regime and its agents. While Zárraga and his immediate family are the only named Plaintiffs at this time, they expressly reserve the right to seek leave to amend this Complaint to add additional plaintiffs or to convert this action into a class action on behalf of a class of similarly situated victims, should that become appropriate as facts develop. This reservation is made in the interest of judicial economy and to give notice to Defendants that the scope of accountability may expand beyond the present Plaintiffs.

20. **Factual Allegations**

21. **Plaintiff Zárraga's Longtime Service at PDVSA and Union Leadership.** Guillermo José Zárraga Lázaro is a veteran petroleum engineer who devoted over thirty years of his career to the Cardón Refinery of Venezuela's state oil company, PDVSA. Rising to the position of a senior engineer and serving as a union leader with the Sindicato Único de Trabajadores Petroleros (SUTPGEF), Mr. Zárraga earned distinction for his

unwavering commitment to operational safety, ethical compliance, and the welfare of his fellow workers. He became a well-known advocate within PDVSA for doing things the right way – insisting on rigorous safety protocols and denouncing the pervasive culture of corruption that had seeped into the oil industry under Venezuela's political regime. Even as systemic wrongdoing took root around him – including alleged drug trafficking operations using PDVSA assets and other criminal enterprises – Mr. Zárraga refused to stay silent. He consistently raised his voice to expose these dangers and misconduct, embodying the role of a principled whistleblower in an environment where speaking truth to power was often met with peril.

22. During his lengthy tenure, Mr. Zárraga repeatedly sounded the alarm (through internal reports and union channels) about deteriorating safety standards, political coercion of the workforce, and illegal activities unfolding within PDVSA's operations. He documented and protested incidents of neglected maintenance and equipment failures that threatened catastrophic accidents, and he openly challenged directives that subordinated technical judgment to political expediency. He was equally outspoken against graft and illicit schemes infecting the company. For example, Mr. Zárraga opposed the misuse of PDVSA assets for unlawful gain – from the siphoning of oil revenues by corrupt officials, to the suspected use of PDVSA's maritime fleet for narcotics trafficking and other smuggling activities. His message was clear: the nation's critical oil infrastructure and its workers' lives were being

put at risk by greed and malfeasance, and he would not be complicit. Through these actions, Mr. Zárraga established himself not only as a highly skilled engineer, but as a fearless defender of integrity in one of the world's most politicized and dangerous work environments.

23. Instead of heeding Mr. Zárraga's warnings, PDVSA's management and those loyal to the ruling regime retaliated against him. Beginning in 2011 – after Mr. Zárraga first blew the whistle on egregious safety lapses and corrupt dealings – company officials and aligned political operatives embarked on a campaign to silence and punish him. Over the ensuing years, he was systematically marginalized within the refinery, stripped of important responsibilities and excluded from decision-making roles he once held. Superiors withheld his earned pay and benefits, denied him promotions and recognition, and subjected him to constant baseless disciplinary measures. The workplace atmosphere around Mr. Zárraga turned hostile and threatening: colleagues were pressured to ostracize him, and anonymous threats began to shadow his day-to-day activities. Despite dedicating decades of exemplary service to PDVSA, Mr. Zárraga was now treated as an enemy simply because he insisted that the company adhere to the law and safety rules rather than serve as a vehicle for fraud and abuse. Through it all, Mr. Zárraga refused to abandon his principles or his post – even as the retaliation intensified, he continued to fulfill his duties and to speak out against wrongdoing whenever lifes or public resources were at stake.

24. A central instrument of this retaliatory campaign was PDVSA's Loss Prevention and Control Unit, commonly known by its Spanish acronym "**PCP**." Ostensibly, the PCP unit was a security and asset-protection office; in reality, it functioned as a militarized internal police force within PDVSA, acting at the behest of the Venezuelan state. The PCP was staffed and led in part by personnel drawn from Venezuela's armed forces, and it operated under the effective control of the Venezuelan military establishment. At all relevant times, the PCP worked in close coordination with the Dirección General de Contrainteligencia Militar (DGCIM) – the regime's military counterintelligence agency – to monitor, intimidate, and neutralize internal dissent. Mr. Zárraga's steadfast opposition to PDVSA's corruption put him squarely in the PCP's sights. Members of this unit surveilled Mr. Zárraga on the job, subjected him to intrusive interrogations over his union activities and outspoken views, and regularly harassed him with menacing warnings to stop "making trouble." Rather than protect employees and assets from genuine threats, the PCP became a tool to protect the corrupt interests that Mr. Zárraga had dared to challenge. Through these heavy-handed tactics, PDVSA – with the backing of state security forces – sought to make an example of Mr. Zárraga and deter others from speaking up as he had.

25. The campaign to oust and silence Mr. Zárraga ultimately culminated in the termination of his employment. In May 2019, PDVSA abruptly and arbitrarily **fired** Mr. Zárraga, bringing his decades-long career to a sudden

end. This dismissal was retaliatory and unlawful on multiple levels. At the time, Mr. Zárraga was an elected union leader (holding the position of Union Grievance Secretary within SUTPGEF), a status that by law carried special protection against termination. Indeed, his firing came just weeks after he had participated in a public oil workers' forum aligned with Venezuela's political opposition – a conference where Mr. Zárraga and others discussed the dire state of the industry and voiced support for reforms to restore transparency and safety. PDVSA's management seized on Mr. Zárraga's openness to such opposition-aligned efforts as a pretext to eliminate him. By purging a prominent whistleblower and union figure, the company sent a chilling message to its workforce. Despite his longstanding loyalty to the refinery and the legal protections shielding union representatives, Mr. Zárraga was cast out for his perceived disloyalty to the Maduro regime and its cronies. Even this did not silence him: after his dismissal, Mr. Zárraga continued to advocate publicly for oil workers' rights and to expose the truth about PDVSA's unsafe practices to anyone who would listen.

26. In 2020, the Venezuelan authorities escalated their reprisals against Mr. Zárraga to a new level, ensnaring him in a fabricated espionage conspiracy. That year, a series of mysterious fires and explosions struck Venezuela's faltering oil refineries. The Maduro government, anxious to deflect blame for these industrial accidents, began advancing a narrative that the damage was the result of deliberate "sabotage" by foreign agents. Mr. Zárraga – as a

respected engineer with intimate knowledge of the refineries – publicly disputed the official story. In interviews and statements, he attributed at least one major refinery explosion (at the Amuay plant in the Paraguaná complex) to operational failures and lack of maintenance, not to any terrorist attack. His professional assessment directly contradicted false claims made by high-ranking officials (including then–Oil Minister Tareck El Aissami, who speculated about a missile or drone strike). Mr. Zárraga's candor infuriated the regime. Around the same time, a photograph surfaced showing Mr. Zárraga alongside opposition leader Juan Guaidó at a public event – an image seized upon by authorities to paint Mr. Zárraga as politically subversive. By the fall of 2020, the Maduro government baselessly branded Guillermo Zárraga as a co-conspirator in what it called the "American Spy" case. In propaganda announcements, officials accused Mr. Zárraga of collaborating with a U.S. operative (the ex-Marine Heath, arrested separately and alleged to be a CIA agent) to sabotage Venezuela's oil industry. These sensational accusations were utterly unfounded – a pretext manufactured to punish Mr. Zárraga for his outspoken honesty and to link him to an imagined foreign plot. Nevertheless, they served their purpose as a green light for the regime's security forces to target him as an enemy of the state.

27. **Night of Terror: DGCIM Raid on Zárraga's Home (Nov. 14, 2020).** In the predawn hours of November 14, 2020, the retaliation against Mr. Zárraga exploded into outright brutality. Just after 3:00 a.m., a squad of armed men

in black tactical gear stormed into Mr. Zárraga's home in Coro, Falcón state. These assailants were operatives of the DGCIM, accompanied by agents of PDVSA's PCP security unit, acting in close concert. With guns drawn, they smashed into the house without warning. Mr. Zárraga's wife and 15-year-old granddaughter (Plaintiffs Jane Doe and A.Z.) woke to the sight of laser sights roaming the walls and masked intruders swarming their residence. The officers seized Mr. Zárraga from his bed, refusing to show any warrant or legal basis for the raid. In front of his family, Mr. Zárraga was manhandled, handcuffed, and dragged away into the night. Thus began a harrowing ordeal of enforced disappearance and torture. For several days, Mr. Zárraga's whereabouts were unknown to his loved ones. When information did emerge, it became clear that he had been taken to a DGCIM facility and subjected to extreme physical and psychological abuse. Mr. Zárraga – a 59-year-old engineer with no criminal record – was thrown into a cell and **brutally tortured** by government agents. The torment he endured included violent beatings, suffocation techniques (plastic bags or chemical-soaked cloth pressed over his face), and other cruel methods designed to break him and extract false confessions. He was denied access to lawyers and family, and held incommunicado under inhumane conditions. Ultimately, Mr. Zárraga was moved into Venezuela's prison system (specifically, the Yare II prison near Caracas) where he would remain detained without trial for years, as the authorities cynically delayed and reset proceedings to prolong his captivity.

To this day, he has never been afforded a fair adjudication of any charge – his imprisonment was nothing more than punishment for his dissent, in flagrant violation of fundamental human rights.

28. The impact of these events on Mr. Zárraga's family has been devastating. His wife, Jane Doe, and his teenage granddaughter, A.Z., were direct witnesses to the violent raid on November 14, 2020. They watched in horror as armed agents invaded their home and tore Mr. Zárraga away at gunpoint. Both Jane Doe and A.Z. feared for Mr. Zárraga's life – and their own – as the officers ransacked the house and shouted threats. In the aftermath, they were left traumatized and feeling unsafe. Jane Doe, who for decades had seen her husband return safely from the refinery each day, was now forced to endure his disappearance and to live under the pall of constant intimidation. She and A.Z. were themselves targets of menacing behavior by security operatives: following the raid, individuals believed to be affiliated with DGCIM/PCP surveilled the family's home and delivered ominous warnings that any public outcry could lead to further harm. The teenage A.Z., in particular, has suffered severe emotional distress – the memory of that night and the ensuing uncertainty inflicted psychological wounds that linger to this day. The terror of having armed men burst into her bedroom and the prolonged absence of her grandfather caused nightmares, anxiety, and lasting trauma during her formative years. Both Jane Doe and A.Z. continue to grapple with the profound psychological aftermath of these events, including

symptoms of post-traumatic stress. Their pain is a direct consequence of the unlawful actions taken against Mr. Zárraga and the callous disregard for innocent family members shown by the Defendants.

29. This civil action seeks to hold the Defendants accountable for the egregious campaign of retaliation and abuse inflicted on Mr. Zárraga and his family. Plaintiffs Guillermo José Zárraga Lázaro, Jane Doe, and A.Z. bring this Complaint to obtain justice for the wrongs they have suffered – including Mr. Zárraga's unlawful termination of employment, the political retaliation against his protected speech and union activities, the torture and cruel, inhumane treatment he endured, his prolonged arbitrary detention without due process, and the severe emotional and psychological harm caused to Jane Doe and A.Z.. Defendants PDVSA, Nicolás Maduro, and the network of officials and entities who acted in concert with them are each responsible for these violations of law and fundamental rights. In the pages that follow, Plaintiffs set forth their causes of action – under U.S., international, and state law – seeking redress for politically motivated persecution and gross human rights violations. Through this lawsuit, Plaintiffs respectfully request that this Court provide the relief to which they are entitled, and send a clear message that those who trample upon human rights and the rule of law will be held to account, no matter how powerful they may be.

30. **Retaliatory Firing in 2019 and Legal Reinstatement Efforts:** On or about May 17, 2019, PDVSA abruptly terminated Zárraga's employment

under pretextual circumstances. The dismissal was widely regarded as unjustified and politically motivated, stemming from Zárraga's reputation as a critic of corruption and mismanagement. Zárraga immediately challenged his firing through Venezuela's labor-law mechanisms. On May 22, 2019, the regional Labor Inspectorate in Punto Fijo formally admitted his petition and found merit in his claim of unjust termination. The labor authorities issued an order approving Zárraga's **"re-enganche"** (reinstatement) to his prior position, and further ordered PDVSA to pay him back wages for the period of his unemployment. PDVSA management, however, stonewalled compliance with this order. For months, Zárraga and his attorney made repeated trips to PDVSA's offices in Punto Fijo seeking enforcement of the reinstatement, only to be met with silence and delay. By late 2019, it became clear that PDVSA had no intention of honoring the re-enganché mandate. Zárraga's high-profile fight to reclaim his job had marked him as an enemy within the politicized company hierarchy.

31. **Context of Maduro Regime's Repression and "Narco-Terrorism" Enterprise:** During the same period (2019–2020), Venezuela under Nicolás Maduro's rule was characterized by widespread repression of dissent, catastrophic economic collapse, and the regime's reliance on illicit enterprises to cling to power. The Maduro regime – including top officials like Maduro and El Aissami – formed what U.S. authorities describe as the "Cartel of the Suns," a criminal organization embedded within the Venezuelan state that

partners with the Colombian guerrilla group FARC to traffic cocaine and other narcotics internationally. In March 2020, the U.S. Department of Justice unsealed indictments charging Maduro, El Aissami, and others with operating a narco-terrorism conspiracy to "flood the United States with cocaine," using drug money to enrich themselves and corrupt Venezuelan institutions. As U.S. Attorney Geoffrey Berman stated, while these defendants "held lofty titles in Venezuela's political and military leadership, the conduct described … wasn't statecraft or service to the Venezuelan people" – instead "the defendants betrayed the Venezuelan people and corrupted Venezuelan institutions to line their pockets with drug money". To protect this criminal enterprise, the Maduro regime has systematically silenced and terrorized anyone suspected of exposing its crimes or showing disloyalty. Security forces such as the DGCIM and SEBIN (intelligence police) have engaged in a pattern of kidnapping, torture, and murder of those who express criticisms the regime wishes to suppress, or who are believed to possess information the regime wishes to conceal. International observers – including a United Nations fact-finding mission – have documented how, since at least 2014, Venezuelan authorities have committed gross human rights abuses with impunity: for example, detainees are subjected to stress positions like the "crucifixion," suffocation with plastic bags or chemicals, savage beatings with blunt objects, electric shocks to sensitive body parts, death threats and threats to family members, and similar forms of torture.

Such abuses are intended to instill fear and coerce false confessions, all in service of maintaining the regime's grip on power. It is against this backdrop that the events concerning Zárraga unfolded.

32. **Heath Incident: Venezuela's Hunt for a "U.S. Spy."** In early September 2020, Venezuelan authorities arrested a U.S. citizen named Matthew John Heath, a former U.S. Marine, near a coastal oil facility. On September 14, 2020, Venezuela's chief prosecutor (Tarek William Saab) publicly announced that Heath had been caught "as a suspected spy" and was being charged with plotting a terrorist attack to sabotage oil refineries. According to regime statements, Heath was accused of surveilling the Amuay and Cardón refineries (the same complex where Zárraga had worked) and possessing weapons and explosives. The Maduro government touted this as proof of a U.S.-backed plot to cripple Venezuela's infrastructure – a narrative it often uses to deflect blame for domestic failures. Almost immediately, Maduro's agents set out to identify supposed local "accomplices" of Heath within Venezuela. By late September 2020, several Venezuelan nationals had been swept up by DGCIM and accused of conspiring with Heath. Many observers believed the regime was manufacturing a conspiracy to lend credibility to its claims of imperialist sabotage. As a former PDVSA insider and vocal critic, Zárraga was an appealing target for this witch-hunt – the regime could portray him as the "inside man" leaking secrets to the American spy. Additionally, implicating Zárraga served a dual purpose for the regime: it

would permanently rid PDVSA of a troublesome union activist and intimidate other workers who might dissent.

33. **Night of Terror (continued):** *(See DGCIM Raid on November 14, 2020, described above.)*

34. **Enforced Disappearance and Secret Detention:** After Zárraga was snatched from his home, he was effectively "disappeared" by the DGCIM for a period of time. The agents did not tell his wife where they were taking him, and no official record of his detention was provided until much later. Zárraga was transported to an unknown location; in fact, he was covertly moved across the country to the DGCIM's headquarters in Caracas, hundreds of kilometers away. For approximately ten days, Zárraga's family had no confirmation of his whereabouts or condition. In an attempt to cover up the midnight kidnapping, regime officials later falsified records to claim that Zárraga had been arrested on November 16, 2020 (two days after the actual raid) "in flagrante" at a location in Punto Fijo (a public plaza) in the afternoon. This absurd claim – that Zárraga was caught red-handed in broad daylight participating in some illicit act – was a complete fiction designed to sanitize the unlawful operation. It was directly refuted by multiple witnesses to the 3:15 a.m. raid on November 14. The fabrication of an arrest scenario demonstrates the premeditation behind Zárraga's persecution: Defendants intended from the start to bypass legal process and then backfill a story to justify it. For the initial period of detention, Zárraga was held

**incommunicado** – with no access to lawyers, family, or the outside world – a classic enforced disappearance tactic condemned under international law.

35. **Torture at DGCIM Headquarters:** Upon arriving at the DGCIM's main detention facility in Boleíta (Caracas), Zárraga was thrown into a notorious underground cell known as "El sótano 2" (Basement Level 2). There he became one of many political prisoners subjected to the DGCIM's regime of systematic torture and cruel, inhuman or degrading treatment. Over the ensuing days and weeks, DGCIM officers and interrogators inflicted a campaign of torture on Zárraga, with the goal of extracting a false confession implicating himself and others in the alleged refinery sabotage plot. Zárraga was repeatedly beaten, including blows with fists and possibly blunt objects, resulting in severe pain. He was subjected to **asphyxiation** tactics – such as having plastic bags or chemical-soaked cloths pressed over his face – to the point of nearly suffocating, a torture method frequently documented in Venezuela. Interrogators also administered psychological torture: Zárraga was kept in total darkness for extended periods and threatened incessantly. DGCIM agents menaced him with death, telling him that if he did not "cooperate" he would leave the facility in a body bag. They also threatened to harm his family, explicitly using his wife's and children's safety as leverage. At one point, interrogators showed Zárraga photographs of his loved ones and chillingly described "what could happen" to them if he didn't confess. Zárraga was sleep-deprived, denied adequate food and water, and kept in squalid

conditions. Throughout these torture sessions, the captors demanded that Zárraga "confess" to being part of a sabotage plan with Heath. They insisted he divulge the supposed plans organized with "the American," and name other co-conspirators. Zárraga was bewildered – he had never met or communicated with Heath (who had been arrested in September, a fact that made the accusations even more implausible). He truthfully told the DGCIM that he had no knowledge of any plot and no connection to Heath or the other accused individuals. This only enraged his torturers further. They intensified the torture, at times forcing Zárraga into stress positions and handcuffing him for hours in painful contortions. They mocked his explanations and accused him of lying, cycling between brutal violence and mock "friendly" offers to spare him if he "simply told them what they wanted." On multiple occasions, Zárraga was brought to the brink of losing consciousness or suffering permanent injury. Indeed, at one stage, the DGCIM agents themselves remarked that if they continued the torture much longer, they might kill him without ever getting a confession. This indicates that Zárraga's refusal to fabricate a story frustrated his captors, yet they were willing to risk killing him in the process of trying to force one. Zárraga's ordeal exemplified "torture" as defined by international and U.S. law: the deliberate infliction of severe physical and mental pain by officials to obtain information or a false admission.

36. **Bogus Charges and Sham Prosecution:** Despite never obtaining any genuine evidence or confession, Venezuelan authorities went forward with prosecuting Zárraga as a captured "terrorist." On November 24, 2020 – ten days after his abduction – a Caracas court (undoubtedly taking direction from the regime) rubber-stamped a **preventive detention order** (*medida privativa de libertad*) against Zárraga. He was formally charged with grave crimes: Terrorism, Treason to the Fatherland, and Criminal Association (conspiracy). These charges were entirely baseless and supported only by falsified statements. For example, the case file fabricated by the Prosecutor's Office alleged that Zárraga had been caught "red-handed" on Nov. 16 delivering classified information to Matthew Heath's network. It cited two anonymous "protected witnesses" who supposedly saw Zárraga handing over data at an afternoon meeting in a public plaza. This story was a brazen lie: as noted, Zárraga was in DGCIM custody in Caracas at the time of the alleged plaza meeting, and witnesses had seen him taken from his home days earlier. Furthermore, prosecutors absurdly accused Zárraga of having provided Heath with "classified and high-confidentiality information" that could endanger the operational stability of Venezuelan refineries in Falcón **and the CITGO refineries in the United States owned by PDVSA**. By inserting CITGO (a U.S.-based asset) into the accusation, the regime sought to dramatize the supposed threat and perhaps lay a pretext for involving U.S. jurisdiction. Ironically, this also underscores the U.S. nexus of the case: the

Venezuelan regime itself claimed that the alleged conspiracy could affect U.S. installations. Zárraga was also accused of having drawn or possessed a "neuralgic schematic" of the Cardón Refinery's FCC unit – essentially an engineering diagram – which authorities painted as some kind of espionage tool. In reality, as Zárraga later explained, any such diagram was part of publicly known projects from a decade earlier and hardly secret. The inclusion of this charge further illustrates the bad faith at play: the regime criminalized ordinary engineering work to bolster their narrative.

37. Throughout 2021 and 2022, Zárraga remained incarcerated without trial, as his case was drawn out in a Venezuelan court that afforded him no presumption of innocence or due process. The proceedings were a sham: judges and prosecutors deferred to DGCIM "evidence," denied most defense requests, and kept Zárraga in custody on continually delayed and spurious grounds. Zárraga's family and attorney feared that, despite the lack of evidence, the regime fully intended to secure a conviction as a matter of political expediency. Indeed, by 2023 there were indications that a guilty verdict (and lengthy prison sentence) was being arranged behind closed doors. Zárraga's fate likely would have been sealed had external events not intervened.

38. **Conditions of Confinement and Health Deterioration:** During his approximately three years of detention, Zárraga was held in dreadful conditions that amounted to ongoing cruel and inhumane treatment even

beyond the acute torture episodes. He spent significant time in DGCIM's basement cells and was later transferred to various prisons, including (on information and belief) Yare III prison – a facility known for harsh conditions – where several political detainees in the Heath case were kept. Zárraga's health declined severely. Reports from late 2022 indicated that he suffered significant weight loss, cardiac issues, and respiratory problems due to neglect and mistreatment in custody. His family learned he was not receiving proper medical care for chronic conditions. Amnesty International and other human rights groups issued urgent alerts that Zárraga's life was at imminent risk from lack of treatment and the lasting effects of torture. The psychological toll was also immense: being unjustly branded a traitor and isolated took a deep mental health toll. Meanwhile, Zárraga's elderly father – who had been distraught over his son's situation – passed away in 2021 while Zárraga was still imprisoned, a devastating blow exacerbated by the fact that authorities refused to allow Zárraga to attend the funeral or say goodbye. All told, Zárraga lost nearly three years of his life, his career, and his health to this wrongful imprisonment.

39. **Impact on Zárraga's Family:** The harms inflicted by Defendants extend beyond Zárraga to his wife and children. Plaintiff Jane Doe and Plaintiff A.Z. not only endured the terror of the armed raid in their home – an experience that left them with lingering psychological trauma, nightmares, and anxiety – but also suffered through the subsequent years of uncertainty and anguish

about Zárraga's fate. In the immediate aftermath of the November 2020 abduction, Jane Doe and A.Z. were left in a state of shock and fear within Venezuela. They were acutely aware that the regime had labeled Zárraga (and by extension, his family) as enemies of the state, which put them at risk of surveillance, intimidation, or worse. DGCIM agents reportedly kept the family under watch even after Zárraga's arrest, contributing to an atmosphere of intimidation. Mother and daughter struggled financially and emotionally; PDVSA provided no support and, in fact, likely blacklisted the family. A.Z., who was a minor in school, faced stigma and fear that she too might be targeted due to her father's case. The family's telephone and communications were likely monitored, chilling their ability to speak out. Over the course of Zárraga's detention, Jane Doe had to take on the role of advocate, attempting to get information about his condition and legal status. This often meant braving visits to hostile court and prison environments, where she was met with stonewalling and occasional harassment by guards. Each encounter was an ordeal, as she could see the physical deterioration of her husband and was powerless to secure his release. The family's suffering was compounded by the public defamation of Zárraga in Venezuela's state media and official statements, which painted him as a terrorist and traitor. Friends, neighbors, and colleagues in their community heard these allegations. Although many did not believe the propaganda, some relationships were strained or lost. Jane Doe and A.Z. experienced social

isolation and had to live with the knowledge that their family name was tarnished by false accusations. The ongoing trauma significantly impacted their mental health – both have exhibited signs of post-traumatic stress (for example, extreme panic at loud noises or unexpected knocks on the door, flashbacks to the raid, hyper-vigilance, and depression). Eventually, fearing for their safety and with Zárraga still behind bars, Jane Doe and A.Z. fled Venezuela (in or around 2022) to seek refuge abroad. They were able to reunite with Zárraga after his release. In sum, Defendants' actions effectively destroyed the Zárraga family's life as they knew it – forcing them into exile and a permanent state of grief and trauma.

40. **Release and Exile Following International Pressure:** In 2023, a potential opening for Zárraga's freedom emerged in the context of international negotiations. Representatives of Maduro's regime and the Venezuelan opposition entered talks in México and later Barbados, with facilitation by foreign governments (including the United States), aimed at humanitarian prisoner releases and electoral agreements. As a result of these talks – and amid a broader deal in which the U.S. and Venezuela exchanged certain prisoners – Zárraga was unexpectedly released from prison on or about December 20, 2023. This was part of a group liberation of several political prisoners, timed alongside the release of some Americans held in Venezuela and discussions about the status of a Maduro ally (Alex Saab) held by the U.S. The freeing of Zárraga, after over three years in captivity, was a

moment of immense relief but also bittersweet: the regime never acknowledged wrongdoing, and the bogus charges remained technically pending. In fact, even after letting him out of prison, the Maduro-controlled judiciary continued the case against Zárraga, indicating they might convict him in absentia. Upon release, Zárraga was warned by contacts that a conviction and re-arrest were indeed forthcoming. Fearing a cruel bait-and-switch (where freed prisoners are later snatched back up – a known tactic of the regime), Zárraga and his family took immediate action to flee Venezuela. In early 2024, with the help of international refugee organizations, Zárraga escaped to a safe location abroad (initially traveling through Colombia and ultimately reuniting with his son in the United States). His son, who had been in exile for seven years, posted on social media a joyful photo of their reunion, noting that his father had been "kidnapped for three years by the Maduro regime" and is now finally free. Though free, Zárraga bears deep physical and psychological scars from his ordeal. He requires medical treatment for injuries and illnesses exacerbated in custody. Mentally, he continues to suffer PTSD, difficulty sleeping (especially at 3:00 a.m., the haunting hour of his abduction), and anxiety about the safety of relatives still in Venezuela. Plaintiffs Jane Doe and A.Z., now in safe haven with Zárraga, likewise continue to struggle with the trauma of what they endured. They find solace in being together again, but the damage done to their family – the years lost, the pain suffered – cannot be undone.

41. **Defendants' Unlawful Acts as Part of a Widespread Pattern:** The persecution of Zárraga was not an isolated incident by rogue actors; it was a deliberate part of Defendants' established pattern and practice. The Maduro regime and its agents have repeatedly used kidnapping, arbitrary detention, and torture as tools to intimidate the population and silence critics. For example, around the same time as Zárraga's case, numerous other Venezuelans were detained on spurious "terrorism" charges – including journalists, opposition politicians, and even other PDVSA employees – often likewise accused of plotting with foreign adversaries without evidence. The DGCIM in particular developed a reputation as Maduro's torture squad, responsible for atrocities such as the 2018 death of rebel officer Fernando Albán (thrown from a 10th-floor window in DGCIM custody) and the 2019 torture-murder of Navy Captain Rafael Acosta Arévalo. These incidents and many more demonstrate a consistent modus operandi: individuals deemed threats to the regime are seized, brutalized, and sometimes killed, while the state spins narratives painting the victims as criminals or traitors. This pattern has been exhaustively documented by international bodies. The U.N. Fact-Finding Mission report of September 2020 concluded that Maduro's security forces (including the DGCIM) have committed **crimes against humanity**, including systematic torture and persecution, directed from the highest levels of authority. Thus, the treatment of Zárraga was not a one-off misfortune – it was a foreseeable and intentional result of policies set by

Maduro and his inner circle (including Defendants Hernández Dala and El Aissami) to quash dissent through terror. By targeting Zárraga – a union man with knowledge of oil operations – they not only silenced his voice but also sent a message to the broader oil workforce (and populace) that collaboration with U.S. "spies" or opposition figures would be met with merciless retribution. The enterprise of the Maduro regime (detailed further below) thrives on this climate of fear to enable its other illicit activities (like narcotics trafficking and graft) to continue unexposed.

42. **Injuries to Plaintiffs:** As a direct and proximate result of Defendants' conduct described above, Plaintiffs have suffered extensive injuries and losses. Zárraga suffered physical injuries (including, but not limited to, lung damage from asphyxiation torture, musculoskeletal injuries from beatings and stress positions, and long-term ailments such as hypertension and cardiac arrhythmia exacerbated by mistreatment), as well as intense pain and suffering and severe emotional distress. He also suffered economic losses: the unlawful termination and subsequent detention caused him to lose his salary, benefits, and pension accrual at PDVSA (none of which have been compensated), and he incurred out-of-pocket legal costs in Venezuela attempting to defend himself. Zárraga's career and professional reputation were destroyed; he effectively lost a lifelong career and must start anew in exile, with diminished earning capacity. Plaintiff Jane Doe and Plaintiff A.Z. have suffered their own emotional distress, including trauma symptoms, loss

of their home and community, and loss of the companionship and support of Zárraga during his detention. They also sustained **assault and battery** upon their persons (having guns pointed at them and being forced to the floor during the raid), resulting in psychological injury. The Plaintiffs as a family incurred expenses related to fleeing Venezuela and resettling (travel costs, relocation expenses, therapy and medical bills related to trauma), and they anticipate ongoing costs for medical and psychological care. Additionally, **reputational injury** was suffered by Zárraga: being branded a terrorist/traitor by his own nation is a stigma that carries both personal and professional harm. Defendants' defamatory statements (via official channels and media) have damaged Zárraga's standing among colleagues and even extended family, creating the need for public vindication.

43. **CAUSES OF ACTION**

44. *Each of the following counts re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein, and further alleges as follows:*

45. **COUNT I – Violations of International Law**

46. **(Alien Tort Statute, 28 U.S.C. § 1350)**

    *(By All Plaintiffs Against All Defendants)*

47. **Alien Tort Statute Jurisdiction:** This claim is brought under the **Alien Tort Statute (ATS)**, 28 U.S.C. § 1350, which provides federal jurisdiction over torts committed in violation of the law of nations (customary

international law) or a U.S. treaty. Plaintiffs, as non-U.S. citizens who have suffered egregious abuses, invoke the ATS for Defendants' violations of clear, universally accepted norms of international law. The acts described herein – including torture, cruel inhuman or degrading treatment, prolonged arbitrary detention, and crimes against humanity – violate specific, universal, and obligatory norms of customary international law, and thus are actionable under the ATS. *See, e.g., Filártiga v. Peña-Irala*, 630 F.2d 876, 880 (2d Cir. 1980) (recognizing official torture as a violation of the law of nations actionable under the ATS); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (only norms with "specific, universal, and obligatory" character, such as the prohibition of torture, are cognizable under ATS).

48. **Status of Defendants and Color of Law:** At all relevant times, Defendants acted under **color of law** of Venezuela. Defendants Maduro, Hernández Dala, and El Aissami held high offices in the Venezuelan government (de facto, even if not recognized as legitimate by the U.S.) and directed or enabled security forces (such as the DGCIM and PDVSA's PCP security department) to carry out the abuses against Plaintiffs. Defendant PDVSA is an instrumentality of the Venezuelan state, and its agents likewise acted under color of law. The DGCIM and other John Doe Defendants were officials or agents of Venezuela carrying out official functions (albeit illegal ones). All Defendants' conduct was performed under the guise of official authority – for example, the raid on Zárraga's home was done by uniformed

officers citing state security, and Zárraga's detention and torture occurred in official facilities. Thus, there is the requisite state action for attributing these acts to Venezuela for purposes of international law violations. However, even if certain acts were **ultra vires** (beyond lawful authority), Defendants are still liable under the ATS as primary participants in joint criminal activity violating international norms.

49. **Violations of International Law:** Defendants, acting individually and in concert, committed and/or aided and abetted multiple violations of the most fundamental prohibitions of international law, including but not limited to:

50. a. **Torture:** Defendants subjected Plaintiff Zárraga to **torture**, as defined in customary international law and as reflected in the U.N. **Convention Against Torture**. Defendants intentionally inflicted severe physical pain and suffering (through beatings, suffocation, stress positions, etc.) and severe mental pain and suffering (through death threats and threats to his family, sensory deprivation, etc.) upon Zárraga while he was under their custody and control, for the purpose of coercing a confession, punishing him for his perceived disloyalty, and intimidating both him and others. Torture by state officials is universally condemned and is a violation of **jus cogens** (a peremptory norm of international law). Defendants' actions violated the prohibition of torture under international law. Plaintiffs Jane Doe and A.Z. were also victims of torture or, at minimum, cruel and inhuman treatment: having loaded guns pressed to one's head and being forced to watch one's

husband/father abducted is a form of mental torture intentionally used by Defendants to break Zárraga's resistance. Their suffering was a direct result of Defendants' actions and was deliberately inflicted to leverage emotional pain against Zárraga (a classic torture tactic).

51. b. **Cruel, Inhuman or Degrading Treatment (CIDT):** In addition or in the alternative, Defendants' treatment of all Plaintiffs constituted cruel, inhuman or degrading treatment or punishment, which is likewise universally forbidden by international law (e.g. Article 7 of the **International Covenant on Civil and Political Rights**, and customary norms). The abuse inflicted – such as brutalizing Zárraga without necessarily meeting the technical severity threshold of torture in every instance, and terrorizing Jane Doe and A.Z. during and after the raid – falls squarely within the prohibition on CIDT. Defendants intentionally caused serious mental and physical suffering that outrages the conscience of humanity, for purposes of punishment, intimidation, and coercion.

52. c. **Prolonged Arbitrary Detention:** Defendants kept Zárraga in prolonged detention without due process, in violation of the international law norm against arbitrary detention (reflected in instruments like the **Universal Declaration of Human Rights** and the **International Covenant on Civil and Political Rights**). Zárraga was held for over three years without a fair trial or even a lawful arrest warrant, on baseless charges and with grossly deficient legal proceedings. Such detention was arbitrary and unlawful under

international standards. It was imposed to persecute Zárraga for his speech and associations, not to respond to any legitimate offense.

53. d. **Crimes Against Humanity (Persecution):** Defendants' acts were part of a widespread or systematic attack directed against a civilian population (namely, perceived dissidents and opposition figures in Venezuela), with knowledge of the attack. The kidnapping, torture, and unlawful imprisonment of Zárraga – as well as similar abuses against many others – constituted **persecution on political grounds**, which is a crime against humanity under customary international law (as defined in sources like the Rome Statute of the International Criminal Court, to which these norms are attributable even if Venezuela is not a party). Defendants targeted Zárraga because of his political opinions and whistleblowing, intentionally depriving him of fundamental rights (liberty, security, dignity) in a manner that gravely violated international law. This was part of a broader policy of repression by the Maduro regime. As such, Defendants are liable under the ATS for perpetrating or aiding and abetting crimes against humanity.

54. **Legal Citations (Count I):** 28 U.S.C. § 1350; *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir. 1980); *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004); *Kadíc v. Karadžić*, 70 F.3d 232 (2d Cir. 1995) (recognizing ATS liability for torture and crimes against humanity under color of law); **UN Convention Against Torture** (1984); **Universal Declaration of Human Rights**, arts. 5, 9; **ICCPR**, arts. 7, 9.

55. **COUNT II – Torture and Cruel Treatment**

56. **(Torture Victim Protection Act, Pub. L. 102-256, 28 U.S.C. § 1350 note)**

    *(By Plaintiff Zárraga Against Defendants Maduro, Hernández Dala, El Aissami, and Does 1–10)*

57. Plaintiff Zárraga re-alleges and incorporates by reference all preceding paragraphs. This cause of action is brought under the **Torture Victim Protection Act of 1991 (TVPA)**, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note), which provides a civil remedy for victims of torture and/or extrajudicial killing committed under authority or color of law of any foreign nation.

58. **Defendants' Liability Under Color of Law:** This claim is brought against the individual Defendants Maduro, Hernández Dala, El Aissami, and Does 1–10, each of whom is an **individual** liable under the TVPA (*Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) (TVPA permits suits against natural persons only)). The TVPA does not permit suits against agencies or entities, so Defendant PDVSA (and its Ad Hoc Board) is not named in this count; however, the individual Defendants include those who directed PDVSA's security or resources in furtherance of the acts. Each of these Defendants, as described, was acting under actual or apparent authority, or color of law, of the Venezuelan government. Maduro was (and is) the de facto head of state, issuing orders to security forces; Hernández Dala commanded the DGCIM; El Aissami was a high-ranking official giving directives in the security sphere; and Does 1–10 were officers or subordinates carrying out

official directives. The kidnapping, detention, and interrogation of Zárraga were done under the badge of governmental authority (albeit abused authority), satisfying the TVPA's "color of law" element.

59. **Torture of Zárraga:** Defendants, acting in concert and personally, subjected Plaintiff Zárraga to **torture** as defined by the TVPA. The TVPA defines "torture" as any act, directed against an individual in the offender's custody or physical control, by which **severe pain or suffering** (physical or mental) is intentionally inflicted for purposes such as obtaining information or a confession, punishing, intimidating, or coercing, or for any reason based on discrimination. As detailed above, Zárraga was in the custody of Defendants' agents from November 2020 through late 2023. During that time, Defendants (through DGCIM interrogators, with the approval of superiors) intentionally inflicted severe physical pain and suffering on Zárraga, including violent beatings, asphyxiation techniques that nearly suffocated him, extended shackling in stress positions causing excruciating pain, and other physical abuse. Defendants also intentionally inflicted severe mental pain and suffering, including credible threats to kill Zárraga, threats to rape or harm his wife and children, mock executions, and relentless fear and humiliation. The severity of this physical and mental anguish easily meets the TVPA's threshold for torture (which requires "severe" pain and suffering). The purposes behind this abuse were explicit: to coerce a confession/information (about an alleged sabotage plot), to punish Zárraga for his presumed

involvement and for his oppositionist background, and to intimidate both Zárraga and, by example, other potential dissenters. These purposes correspond to those enumerated in the TVPA's definition. Thus, Defendants' conduct constituted torture under the TVPA.

60. **Liability of Each Defendant:** Each Defendant named in this count is liable for Zárraga's torture under one or more TVPA theories:

61. **Direct Liability:** One or more of the John Doe Defendants directly carried out the physical acts of torture (e.g. the DGCIM officers who beat Zárraga or threatened him). These individuals are directly liable as primary torturers under the TVPA.

62. **Command/Organizational Responsibility:** Defendants Maduro, Hernández Dala, and El Aissami each commanded, authorized, or agreed to the torture. Maduro, as the de facto chief executive, knew of and approved the interrogation tactics used on high-value detainees like Zárraga. Hernández Dala, as head of DGCIM, oversaw the operation and allowed or encouraged torture as part of DGCIM's modus operandi. El Aissami, who initiated Zárraga's targeting, also knew that torture would be employed to fabricate evidence for the "American Spy" narrative. Under the TVPA, an official who orders or acquiesces in torture can be held liable just as those who physically commit it. Additionally, to the extent **command responsibility** is applicable, these superior officers exercised effective

control over the subordinates who tortured Zárraga and failed to prevent or punish the abuses, further supporting liability.

63. **Aiding and Abetting/Joint Liability:** All Defendants named in this count worked in concert. They each played a role that substantially assisted or facilitated the torture. For example, El Aissami's act of naming Zárraga as a suspect and instructing security forces to detain him was a necessary step that led directly to the torture sessions. Hernández Dala's deployment of DGCIM personnel, and Maduro's provision of overarching approval and resources, were also essential to the commission of torture. Under theories of aiding and abetting or joint venture liability, these actions render each of these Defendants liable for the torture carried out by their agents. They formed part of a common plan to break Zárraga via torture.

64. By virtue of the foregoing, Defendants Maduro, Hernández Dala, El Aissami, and Does 1–10 are each **liable for torture** under the TVPA. Zárraga suffered severe physical and mental harm as a result of their actions, entitling him to relief.

65. **Legal Citations (Count II):** Torture Victim Protection Act of 1991, Pub. L. 102-256, § 3(b), 106 Stat. 73 (definition of "torture"); *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) (TVPA defendants must be individuals); *Chowdhury v. Worldtel Bangl. Holding, Ltd.*, 746 F.3d 42,

52 (2d Cir. 2014) (acts causing severe pain to extract information constituted torture under TVPA); *Cabello v. Fernández-Larios*, 402 F.3d 1148, 1157–58 (11th Cir. 2005) (applying command responsibility and aiding/abetting liability under TVPA).

66. **COUNT III – Civil Remedies for Terrorism**

67. **(Florida Anti-Terrorism Act, Fla. Stat. § 772.13)**

    *(By All Plaintiffs Against All Defendants)*

68. Plaintiffs re-allege and incorporate by reference all preceding paragraphs. This count is brought under the **Florida Anti-Terrorism Act**, Fla. Stat. § 772.13 (the "Florida ATA"), which provides a civil cause of action for any person injured by an act of "terrorism" or by actions in furtherance of terrorism.

69. **Terrorism as Defined by Law:** The Florida ATA adopts the definition of "terrorism" from Fla. Stat. § 775.30. Under that statute, an "act of terrorism" means a violent act or an act dangerous to human life, in violation of the criminal laws of the United States or of any state, that is intended to: (a) intimidate, injure, or coerce a civilian population; (b) influence the policy of a government by intimidation or coercion; or (c) affect the conduct of government through destruction of property, assassination, or kidnapping. Additionally, providing material support to terrorists or concealing an escape also qualifies as furthering terrorism. The conduct of Defendants described herein falls squarely within this definition. Defendants' actions – including

the armed home invasion, kidnapping of Zárraga, and the torture and brutalization of Plaintiffs – are violent acts dangerous to human life and are crimes under any applicable law (e.g. kidnapping, aggravated assault with a deadly weapon, battery, etc., all of which are felonies under Florida law if they had occurred here, as well as under Venezuelan law, notwithstanding the state sanction). Moreover, these acts were inherently intended to intimidate or coerce a civilian population and to influence government policy by coercion. Specifically, Defendants carried out these acts to intimidate the Venezuelan populace (especially oil workers and opposition sympathizers) by making an example of Zárraga – thereby terrorizing the civilian population into refraining from opposing Maduro's regime. The acts were also intended to influence the policies of other governments: by using Zárraga as a pawn in Maduro's narrative of a U.S. "spy" conspiracy, Defendants aimed to coerce the United States and other countries into refraining from interference (the implicit message being that "spies" will be dealt with severely – effectively a form of state terror). Critically, the nature of the act – a kidnapping – is expressly listed as a means of terrorism in the statutory definition. Thus, Defendants' conduct qualifies as "terrorism" under Florida law.

70. **Commission and Furtherance of Terrorism:** Each Defendant either committed acts of terrorism or provided material support or assistance in furtherance of such acts, within the meaning of Fla. Stat. § 772.13. Defendant Maduro and his co-defendants orchestrated a campaign of state-sponsored

terror sometimes referred to as the "Maduro Criminal Enterprise." This campaign uses proceeds from narcotics sales and other crimes to fund violent repression and terrorism at home. The specific incident involving Plaintiffs was one episode of this broader terrorist scheme. Defendant El Aissami's ordering of Zárraga's abduction, Defendant Hernández Dala's deployment of DGCIM kidnappers, and PDVSA's collusion in fabricating the pretext all constitute participation in the terrorist act. Further, Defendants have known affiliations with designated foreign terrorist organizations (like the FARC) and narcotrafficking networks, meaning they meet even the broader federal concept of "international terrorism." But under Florida's statute, we need not prove an international link – it suffices that they engaged in violent crimes to intimidate or coerce. The home raid, the torture sessions, and the false prosecution all were calculated to instill extreme fear (terror) not only in Zárraga but in the oil worker community and general populace, thereby advancing Defendants' unlawful objectives.

71. **Injury and Statutory Damages:** Plaintiffs were each injured by Defendants' acts of terrorism or material support thereof. Zárraga suffered bodily injury and extreme mental anguish from being a direct victim of Defendants' terrorist acts (kidnapping and torture). Jane Doe and A.Z. suffered emotional injury and assault as direct victims of the terrorizing home invasion and subsequent threats. All Plaintiffs have also incurred economic losses related to the aftermath (relocation, therapy, etc.). Under the

Florida ATA, any person injured by reason of an act of terrorism has a cause of action for triple damages, costs, and attorney's fees. Plaintiffs seek all remedies available under Fla. Stat. § 772.13, including **treble damages** for the injuries caused by Defendants' intentional terrorist conduct.

72. **Legal Citations (Count III):** Fla. Stat. § 772.13; Fla. Stat. § 775.30 (defining "terrorism" and "terrorist activity"); *Gil v. Wells Fargo, N.A.*, 383 F. Supp. 3d 1030, 1036 (N.D. Cal. 2019) (noting civil remedy under Florida ATA for victims of terrorism, similar to federal ATA); **18 U.S.C. § 2331** (federal definition of international terrorism, referenced for context).

73. **COUNT IV – Civil Racketeer Influenced and Corrupt Organizations (RICO)**

74. **(18 U.S.C. § 1962(c))**

   *(By Plaintiff Zárraga (and Jane Doe) Against Defendants Maduro, Hernández Dala, El Aissami, and Does 1–10)*

75. Plaintiffs incorporate by reference the allegations in all preceding paragraphs. Plaintiff **Guillermo Zárraga** brings this claim under the federal Racketeer Influenced and Corrupt Organizations Act (**RICO**), 18 U.S.C. § 1961 *et seq.*, specifically 18 U.S.C. § 1962(c). (Plaintiff **Jane Doe** joins in this claim to the extent she suffered injury to business or property – as opposed to personal injury – from the racketeering acts. While her primary

injuries are personal and emotional, Plaintiffs include her in this claim in the alternative, for any economic losses she incurred due to the enterprise's acts.)

76. **RICO "Enterprise":** Defendants and their associates formed an **association-in-fact enterprise**, referred to here as the "Maduro Criminal Enterprise" (also known by some as the "Cartel of the Suns"). This enterprise is an ongoing organization, formal or informal, with a common purpose: to enrich its members and preserve their power through a pattern of racketeering activity including drug trafficking, acts of violence, extortion, money laundering, and corruption. It is composed of individuals and entities, including but not limited to: Defendant Maduro and top Venezuelan officials (such as Defendants Hernández Dala and El Aissami, as well as others like members of Maduro's inner circle and security apparatus), elements of the Venezuelan military and intelligence services (including DGCIM units under Hernández Dala's command), elements of PDVSA (which provided resources for illicit self-enrichment and facilitated money laundering), and external criminal partners like the Colombian FARC and other drug cartels. This enterprise has functioned continuously since at least the mid-2000s and continues to this day. It has a structure: Maduro and his inner circle provide leadership; security forces like DGCIM carry out directives (including intimidation, kidnappings, etc.); PDVSA and other state entities are pillaged for funds or used to launder money; and foreign partners help with drug production and distribution. The enterprise engages in interstate and

international commerce, affecting the United States (particularly Florida) by sending narcotics into U.S. markets and moving illicit money through U.S. financial systems. Thus, it is an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

77. **Conduct/Participation:** Each Defendant sued under this count is a "person" as defined in 18 U.S.C. § 1961(3) (individuals capable of holding a legal or beneficial interest in property). Defendants Maduro, Hernández Dala, El Aissami, and certain Doe Defendants **conducted or participated**, directly or indirectly, in the conduct of the Maduro Criminal Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). They operated as key figures or agents in the enterprise. For instance: Maduro acted as a leader/organizer, setting overall strategy (e.g. instructing that proceeds from drug sales be used to fund repressive operations, or approving the targeting of individuals who threaten the enterprise); El Aissami served as both a financial facilitator (overseeing oil contracts and kickbacks, laundering funds) and an enforcer (ordering arrests of perceived enemies to protect enterprise secrets); Hernández Dala managed the DGCIM arm of the enterprise, deploying personnel to commit acts of violence (kidnappings, torture) that furthered the enterprise's goals of intimidation and protection of its drug/corruption rackets. The Doe Defendants in this count (certain DGCIM or other operatives) acted as

lower-level participants implementing the schemes (e.g. carrying out kidnappings, guarding drug shipments, etc.).

78. **Racketeering Acts (Pattern of Activity):** The racketeering activity ("predicate acts") conducted by these Defendants includes multiple violations of U.S. federal law, as well as analogous state offenses, that are enumerated in 18 U.S.C. § 1961(1). Specifically, and without limitation, the enterprise (through Defendants and their co-conspirators) engaged in:

79. **Kidnapping and Extortion:** The abduction of Zárraga in November 2020 was an act indictable under 18 U.S.C. § 1201 (kidnapping) if committed in U.S. jurisdiction, and it was done in furtherance of extortion (to force a confession and silence him, thereby protecting the enterprise). It also constitutes extortion under laws such as 18 U.S.C. § 1951 (Hobbs Act) insofar as Defendants obtained Zárraga's property or rights (his freedom, and attempted to obtain information and false testimony) through wrongful use of force and threats. This was one predicate act in the pattern.

80. **Drug Trafficking:** Defendants Maduro and El Aissami (among others) participated in a long-running conspiracy to distribute cocaine internationally, including to the United States, in violation of 21 U.S.C. §§ 959, 960, and 963. As noted, U.S. indictments charge them with overseeing shipments of tons of cocaine through Venezuelan territory into North America. This narcotics trafficking activity constitutes multiple predicate

acts under RICO (distribution and importation of controlled substances).

81. **Money Laundering:** The enterprise engaged in laundering of monetary instruments (18 U.S.C. § 1956) by moving proceeds from drug sales and corruption through banks and shell companies, including transactions in Florida and other parts of the U.S. This was done to conceal the source and ownership of illicit funds. For example, PDVSA's accounts and contracts were used to funnel bribes and drug money which then passed through Florida bank accounts, implicating U.S. financial institutions.

82. **Acts of Violence:** In addition to Zárraga's kidnapping and torture, the enterprise is responsible for numerous acts of violence and intimidation in Venezuela. Many of those acts – such as the torture and murder of Captain Acosta (a vocal critic) – would constitute predicate offenses like murder (18 U.S.C. § 1111) or assault if within U.S. jurisdiction. Even though these particular acts occurred abroad, they form part of the pattern of related racketeering acts because they share common purposes (silencing dissent, protecting the enterprise) and involve the same participants.

83. These acts were **related** to each other and have continuity, forming a pattern. They were not isolated incidents, but rather the modus operandi of the enterprise. The acts shared the common purposes of enriching

Defendants and maintaining their power through fear. They extended over many years (showing closed- and open-ended continuity) and threaten continued recurrence. Notably, the kidnapping and extortion of Zárraga in 2020 was directly connected to the enterprise's broader scheme of using violence and terror to safeguard its criminal activities (like the drug trafficking). In sum, Defendants' conduct meets the pattern requirement of at least two racketeering acts within ten years, with the acts being related and continuous.

84. **Injury to Business or Property:** Plaintiff Zárraga has been **injured in his business or property** by reason of the above RICO violations. In particular, Zárraga lost his employment, salary, and benefits at PDVSA as a direct result of Defendants' racketeering acts (his retaliatory firing was part of the scheme to silence him and protect the enterprise). He also lost other business opportunities and income because he was imprisoned and defamed, which destroyed his career prospects. These constitute injuries to "business or property" under 18 U.S.C. § 1964(c). Additionally, Zárraga's personal property (e.g. personal funds spent on legal defense) was depleted. (Plaintiff Jane Doe, as noted, joins to the extent she lost any property – for example, if she had shared income or had to sell assets due to Defendants' actions. At this time, Zárraga's economic losses are the clearest basis for damages.)

85. Because of these injuries to business or property, Plaintiff Zárraga (and Jane Doe to the extent of any economic harm) is entitled to recover **treble**

**damages** under RICO, as well as costs and attorney's fees (18 U.S.C. § 1964(c)). The amount of these damages includes, inter alia, the value of lost past and future earnings, lost benefits, and lost earning capacity, multiplied as provided by law.

86. **Legal Citations (Count IV):** 18 U.S.C. §§ 1961–1962; *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) (civil RICO provides remedy for economic injuries from racketeering acts, with liberal construction of statute); *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016) (discussing domestic injury requirement for private RICO claims – here, Plaintiffs' injury includes lost wages connected to U.S.-linked enterprise activities); *United States v. Maddux*, 917 F.3d 437, 443 (6th Cir. 2019) (affirming drug trafficking conspiracy with intent to distribute in U.S. as predicate for RICO); 18 U.S.C. § 1961(1) (defining racketeering acts, including kidnapping, robbery/extortion, dealing in controlled substances, money laundering, and acts indictable under Title IX).

87. **COUNT V – Conspiracy to Conduct Racketeering**

88. **(RICO Conspiracy, 18 U.S.C. § 1962(d))**

   *(By Plaintiff Zárraga Against Defendants Maduro, Hernández Dala, El Aissami, and Does 1–10)*

89. Plaintiffs re-allege and incorporate by reference all preceding paragraphs. This count is brought under 18 U.S.C. § 1962(d), which makes it unlawful for

any person to conspire to violate any provision of § 1962, including the substantive RICO provision (§ 1962(c)) at issue in Count IV.

90. **Agreement to Violate RICO:** Defendants Maduro, Hernández Dala, El Aissami, and Does 1–10 (along with other members of the Maduro Criminal Enterprise) knowingly **agreed and conspired** to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity, as described in Count IV. Each defendant was aware of the essential nature and scope of the enterprise and agreed that he and/or some member of the conspiracy would commit at least two racketeering acts (such as narcotics trafficking, kidnapping, or extortion) in furtherance of the enterprise's objectives. There was a **meeting of the minds** among these Defendants – explicit or tacit – that they would work together to perpetrate the enterprise's illegal schemes.

91. This agreement can be inferred from their concerted actions. For example, Maduro, El Aissami, and Hernández Dala worked in concert for years: Maduro empowered El Aissami to handle both drug finances and repression; El Aissami coordinated with Hernández Dala to target and detain individuals like Zárraga; and all three benefited from enterprise profits. Their roles were complementary and mutually reinforcing, indicating an ongoing **conspiratorial partnership**. They communicated and coordinated efforts to ensure the enterprise's success (e.g. sharing intelligence about "threats" like Zárraga, deciding when to stage arrests to coincide with propaganda needs,

etc.). This is far more than parallel conduct – it is an actual agreement to use **patterned criminal acts** to achieve their common goals of enrichment and power maintenance.

92. **Overt Acts and Liability:** Under RICO conspiracy, it is not necessary that each conspirator personally commit two predicate acts; it suffices that they agreed that the acts would be committed by a member of the conspiracy. Here, multiple overt acts in furtherance of the conspiracy occurred, including: the narcotics shipments and money laundering transactions mentioned; the retaliatory firing and blacklisting of Zárraga; the planning and execution of Zárraga's abduction and torture; and the cover-up falsifications in the criminal case. Each Defendant took actions (or omissions) furthering the conspiracy: for instance, Hernández Dala directed subordinates to carry out violent acts, and El Aissami provided the impetus and political backing for targeting Zárraga. Even if any individual Defendant did not personally carry out a predicate act, they are still liable as conspirators so long as they intentionally agreed to facilitate the scheme and a co-conspirator committed acts of racketeering. *See Salinas v. United States*, 522 U.S. 52, 64 (1997) (a RICO conspirator need not personally commit the predicate acts, as long as he agreed to the commission of acts by the enterprise).

93. **Injury:** Plaintiff Zárraga (and Jane Doe to the extent of her economic harm) suffered injury to business or property by reason of the RICO conspiracy, as outlined in Count IV. Under § 1964(c), a conspirator is liable for the damages

caused by the acts of co-conspirators in furtherance of the conspiracy, even if the conspirator did not personally commit each act. Thus, all Defendants who joined the conspiracy are jointly liable for the entire amount of treble damages. The injuries here – lost wages, loss of career, etc. – were the direct and foreseeable result of the conspiracy's acts, as the scheme inherently involved silencing Zárraga (ruining his career and livelihood) and depriving him of property to fund their enterprise.

94. **Relief:** Plaintiffs seek the same relief for the RICO conspiracy as for the substantive RICO count: an award of **treble damages** for their economic injuries, plus costs and attorney's fees, as provided by 18 U.S.C. § 1964(c). Even if the Court finds any Defendant not directly liable under § 1962(c), that Defendant can be found liable under § 1962(d) for conspiring with others to violate RICO, which carries the same damages consequences.

95. **Legal Citations (Count V):** 18 U.S.C. § 1962(d); *Salinas v. United States*, 522 U.S. 52 (1997) (scope of RICO conspiracy liability); *Beck v. Prupis*, 529 U.S. 494, 507 (2000) (civil RICO conspiracy plaintiff must show injury from an overt act that is itself racketeering or otherwise unlawful under RICO); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (RICO conspiracy may be established via circumstantial evidence of common understanding to carry out the racketeering scheme).

96. **COUNT VI – Defamation Per Se**

97. *(By Plaintiff Zárraga Against Maduro, Saab and El Aissami)*

98. Plaintiff Zárraga incorporates by reference all preceding paragraphs. This is a defamation claim under Florida common law (and/or other applicable law under choice-of-law principles). Florida has a significant interest in this claim, as Plaintiff now resides here and the defamatory statements have been published here via internet and media.

99. **Defamatory Statements:** Defendants, individually and through their agents (such as the Venezuelan Prosecutor's Office, state media outlets, and official press releases), made and published **false and defamatory statements** about Plaintiff Zárraga. Specifically, Defendants falsely labeled Zárraga a "**terrorist**," "**traitor**," "**spy**," and an active participant in criminal sabotage plots. For example, on or about September–November 2020, Venezuela's Attorney General (Tarek William Saab, an unindicted co-conspirator) and others publicly announced that a Venezuelan "spy network" working with American Matthew Heath had been dismantled and that multiple Venezuelans (including an oil worker from Falcón) had been caught supplying confidential information to facilitate terrorist attacks. Although initial press releases did not fully name Zárraga, subsequent news coverage by Venezuelan outlets identified "Guillermo Zárraga" as a key detainee in the so-called "*Espía Americano*" ("American Spy") case. State media and officials referred to the detainees as "terrorists" bent on treason. These statements were disseminated widely via television, newspapers, and

internet sites accessible in Florida and worldwide. For instance, an Associated Press report relayed Saab's claims that Heath's conspirators (including "a military officer and four other Venezuelans") were charged with terrorism and weapons trafficking – it is understood that one of those was Zárraga. Efecto Cocuyo (an independent Venezuelan news site) explicitly named Zárraga when he was finally released in 2023, describing him as someone "who had been implicated in the American spy case." Amnesty International and other observers repeated that Venezuelan authorities had accused Zárraga of terrorism and treason without evidence. All such imputations of terrorism, espionage, and treason are **false** – Zárraga never engaged in any such acts. These are statements of **fact** (alleging specific criminal conduct, not mere opinion) that are provably untrue.

100. **Defamation Per Se and Fault:** The false statements made by Defendants are **defamatory per se** under applicable law. They accuse Zárraga of serious crimes – terrorism, espionage, treason – which by their nature subject a person to hatred, distrust, ridicule, and injury in his trade or profession. Under Florida law (and general defamation principles), such accusations of criminal conduct constitute defamation per se, meaning damage to reputation and malice are presumed as a matter of law. *See Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953) ("When a writing which charges a person with the commission of a crime is published, malice and damage are presumed."). Zárraga had a **good reputation** as a law-abiding

engineer and union leader prior to Defendants' statements. The defamatory accusations were made with **actual malice** (in the constitutional sense) and with common-law malice: Defendants knew the statements were false or acted with reckless disregard for the truth, and they intended to harm Zárraga's reputation to serve their agenda. Indeed, the statements were part of a deliberate propaganda effort to justify Zárraga's imprisonment and discredit him. Even if Zárraga is deemed a private figure, Defendants' conduct was at least negligent, but given the context, actual malice is clearly present (the accusations were fabricated with knowledge of falsity).

101. **Publication and Republication:** Defendants published these statements to numerous third parties – domestic and international media, government officials, and the general public – via press conferences, official reports, and media briefings. The statements were republished by news outlets around the world. Under defamation law, those who originated the defamatory statements (or directed their publication) are liable for foreseeable republication. Each Defendant either directly spoke the slanders or aided in their dissemination (for example, by providing false information to state media or failing to retract known falsehoods). The statements reached Florida (where Zárraga now lives) and have damaged his standing in the eyes of the community here and abroad.

102. **Damages:** As a proximate result of the defamatory statements, Zárraga's personal and professional reputation has been gravely injured. He has been

exposed to hatred, contempt, and ridicule. Many who hear his name associate him with terrorism or treason. He has lost employment opportunities and the ability to work in his field without stigma, especially in any roles that require trust and security clearance (which is practically impossible with a cloud of being labeled a "spy/terrorist"). He has suffered mental anguish and humiliation from knowing his name was maligned on the world stage. Because this is defamation per se, general damages (including harm to reputation and mental anguish) are presumed, and Zárraga is entitled to recover without proof of special damages. He seeks **compensatory damages** for reputational harm, emotional distress, and all other actual losses caused by the defamation. In addition, because Defendants acted with malice and abused their power to defame him, Zárraga seeks **punitive damages** to punish and deter such egregious conduct.

103. **Equitable Relief:** Zárraga also seeks any appropriate equitable relief to correct the record, such as a declaration of falsity or an injunction against further defamatory statements by Defendants. Although enforcement may be challenging (given Defendants' foreign status), a judicial finding that the allegations against Zárraga were false would help clear his name. *Cf. Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275 (1971) (noting the important interest in rebutting false charges in defamation cases). If feasible, the Court could order Defendants (or any of their agents present in the U.S.) to cease publishing the false accusations.

104.  **Legal Citations (Count VI):** *Richard v. Gray*, 62 So. 2d 597 (Fla. 1953) (accusations of crime are libel per se in Florida, damages presumed); *Dunne v. Sun-Sentinel Co.*, 472 So. 2d 966 (Fla. 4th DCA 1985) (imputation of a crime is defamatory per se); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (actual malice standard for public figure); Fla. Stat. § 770.01 *et seq.* (notice requirements for defamation suits against media – not applicable to Defendants as they are not U.S. media, but principles of notice have been satisfied by Plaintiffs' public denials of allegations).

105.  **COUNT VII – Civil Conspiracy (Common Law)**

106.  *( Against All Defendants)*

107.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs. In the alternative to some statutory claims, this count pleads a **civil conspiracy** under common law (Florida law, which is substantially similar to general common law of conspiracy).

108.  Under Florida law, a civil conspiracy consists of: **(1)** an agreement between two or more parties to do an unlawful act or to do a lawful act by unlawful means; **(2)** the commission of an overt act in furtherance of the conspiracy; and **(3)** damage to the plaintiff as a result. *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008). All these elements are met here.

109. **Agreement and Unlawful Acts:** Defendants and their co-conspirators (including unidentified officials and agents) entered into an agreement or understanding to commit unlawful acts against Plaintiffs, including but not limited to: the wrongful firing of Zárraga (in violation of Venezuelan labor law and his contractual rights); the **assault**, **battery**, **kidnapping**, and **false imprisonment** of Plaintiffs; the **torture** of Zárraga; and the **intentional infliction of emotional distress** upon all Plaintiffs. This agreement can be inferred from the coordinated nature of Defendants' actions – multiple actors from different parts of the government working in concert (PDVSA management, DGCIM, prosecutors, etc.) to harm Plaintiffs. They shared the objective of punishing and silencing Zárraga, and deterring others by example. Even if some individual Defendants did not directly communicate with each other, they acted in furtherance of a common plan orchestrated by the regime's leadership. Thus, there was a **meeting of the minds** on the essential object: to harm Zárraga (and thereby intimidate others) through unlawful means.

110. **Overt Acts:** In furtherance of this conspiracy, Defendants committed numerous **overt acts**, many of which are independently tortious or unlawful:

111. PDVSA's **issuance of a termination letter** or order in May 2019 to fire Zárraga on false pretenses (an act in furtherance of the plan to punish him for whistleblowing).

112.     Surveillance of Zárraga's movements prior to the raid (likely done by PDVSA's PCP unit feeding information to DGCIM).

113.     The armed **home invasion** on Nov. 14, 2020 by DGCIM agents (an overt act that was clearly unlawful – constituting breaking and entering, assault, false arrest).

114.     The physical **abduction** and handcuffing of Zárraga at gunpoint (kidnapping and battery).

115.     The **transport and incommunicado holding** of Zárraga in secret (overt acts of false imprisonment and kidnapping).

116.     The multiple acts of **torture** inflicted on Zárraga in custody, including beatings and threats (each instance is an overt act, and also a separate tort of battery and/or intentional infliction of emotional distress).

117.     The **filing of false criminal charges** and fabricated evidence by regime prosecutors, including perjured statements about Zárraga's arrest circumstances (unlawful acts constituting abuse of process and defamation, overt acts to keep him imprisoned and discredit him).

118.   Public **media statements** branding Zárraga a terrorist (overt acts furthering the conspiracy by covering up the truth and further injuring his reputation).

119.   The **concealment of evidence** of Zárraga's innocence (such as ignoring witness testimonies that contradicted the regime's story, and suppressing exonerating information – overt acts to continue the false imprisonment).

120.   The refusal to comply with the labor board's reinstatement order, and continued harassment of Zárraga's family (further acts prolonging his harm and pressuring him to submit).

121.   Each of these overt acts was done in furtherance of the conspiracy's goal to harm and silence Zárraga (and to intimidate others by example). The acts are interconnected and coordinated.

122.   **Damage:** Plaintiffs have suffered **damages** as a direct and proximate result of the conspiracy's acts. Zárraga suffered loss of employment, loss of liberty, physical injury, and emotional trauma. Jane Doe and A.Z. suffered severe emotional distress, assault, and loss of consortium/protection from Zárraga during his detention. These damages were not only caused by individual tortfeasors acting alone, but by the concerted actions of all Defendants pursuant to the conspiracy. Under conspiracy liability, each

Defendant is jointly liable for all damages caused by the conspiracy, even if a particular harm was inflicted by another conspirator. The wrongs here — from the firing to the torture to the defamation — were all parts of a single conspiratorial plan, making all Defendants liable for the entirety of harm.

123.   Additionally, because the conspiracy was willful and malicious, Plaintiffs seek **punitive damages** against the Defendants to punish and deter such concerted wrongdoing. Florida law permits recovery of punitive damages in civil conspiracy where the underlying acts involve malice or evil intent (which is clearly present given torture and terror were employed).

124.   **Legal Citations (Count VII):** *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157 (Fla. 3d DCA 2008) (elements of civil conspiracy); *Liappas v. Augoustis*, 47 So. 2d 582, 582–83 (Fla. 1950) (all conspirators liable for acts of co-conspirators); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) (recognizing claim of conspiracy to commit intentional torts, such as intentional infliction of emotional distress); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (conspiracy may aggregate acts of individuals to impose joint liability).

**125.   COUNT VIII – False Imprisonment**

*126.   (By Plaintiff Zárraga Against All Defendants)*

127.   Plaintiff Zárraga re-alleges all preceding paragraphs. This is a claim for **false imprisonment** (also known as false arrest) under applicable tort law

(Florida common law or general common law principles, which are similar). **False imprisonment** is defined as the unlawful restraint of a person against his will, without legal authority or "color of authority." *Johnson v. Weiner*, 155 Fla. 169, 19 So. 2d 699, 701 (1944) ("False imprisonment is the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty.").

128. **Unlawful Restraint:** Defendants, acting in concert, intentionally restrained and confined Plaintiff Zárraga against his will, without lawful justification, from November 14, 2020 until approximately December 20, 2023 (and arguably beyond, considering travel restrictions and threats until he fled the country). The initial act of confinement occurred when armed DGCIM agents forcibly seized Zárraga in his home and handcuffed him, claiming he was under arrest but showing no warrant. They transported him to a secret facility, effectively abducting him. From that moment, Zárraga was not free to leave and was under the total control of Defendants. The confinement continued at the DGCIM prison and then other detention centers. Throughout, it was against Zárraga's will – he certainly did not consent, and in fact, was violently compelled the entire time.

129. **Lack of Legal Authority:** The detention of Zárraga was not legally authorized. Although Defendants will claim it was a lawful arrest and detention on charges, that claim is a **sham** for multiple reasons:

130. **No Warrant or Valid Cause:** The arrest was carried out with no warrant or valid exigent circumstance. Breaking into a home at 3:15 a.m. without a judicial order violates Venezuelan law and basic due process, negating any color of official privilege. Defendants never produced an arrest warrant during the raid or immediately after.

131. **Fabricated Charges (No Probable Cause):** The charges against Zárraga were fabricated – meaning there was **no probable cause** or legitimate basis to hold him. A false arrest claim can lie even if formal charges were filed, if those charges were based on false pretenses. Here, the supposed evidence (claims of spying/sabotage) was concocted; therefore the detention was based on false charges and is deemed unlawful.

132. **Judicial Orders as Cover:** The subsequent court orders (like the November 24, 2020 detention order) were products of coercion and political influence, not genuine due process. In any case, an order issued ten days after an initial disappearance cannot retroactively legalize the initial 10-day **enforced disappearance**. The initial period (Nov. 14–24, 2020) was plainly without any legal process. Even beyond that, the continued detention violated fundamental rights and thus can be viewed as an **abuse of process** rather than lawful imprisonment.

133. **Color of Law vs. Actual Authority:** Under Florida law (persuasive here), false imprisonment can extend to unlawful detention under color of law when the legal process is a mere pretext. That is exactly the situation: the legal proceedings in Venezuela were so deficient and corrupted by fraud that they do not confer legitimacy. We plead that all the time Zárraga was held – even after a judge's involvement – was essentially unlawful confinement, because the process was not recognized as valid or impartial.

134. Therefore, Defendants cannot point to a valid legal authority for Zárraga's detention. The initial arrest was illegal, and everything thereafter was tainted by the initial illegality and ongoing due process violations. The entirety of Zárraga's confinement from 2020 to 2023 was without lawful justification.

135. **Defendants' Roles:** All Defendants either directly participated in the restraint or are vicariously liable for it. The DGCIM agent Defendants (John Does) **physically restrained** Zárraga – they are directly liable for the false imprisonment (they locked him up). Hernández Dala, as their commander, directed or allowed the operation, making him liable via agency principles and as a co-tortfeasor. El Aissami initiated the targeting of Zárraga, thus setting in motion the unlawful confinement – his involvement is a proximate cause of the imprisonment, enough for liability. Maduro, as top authority, approved or later ratified the detention (and failed to release Zárraga despite

knowing the truth), thus effectively adopting and continuing the false imprisonment. Under doctrines like **respondeat superior** (for PDVSA's agents) or **command responsibility** (for officials with knowledge and control), those at the top who orchestrated or tolerated the unlawful detention share liability. PDVSA, to the extent its security personnel were involved in tracking or luring Zárraga (e.g. if an internal PDVSA informant invited him to a meeting under false pretenses prior to the arrest), is also liable for its role in the seizure. Even the PDVSA Ad Hoc Board, while not involved in wrongdoing, is named so that PDVSA's assets can be accessed to satisfy any judgment for this tort.

136. **Damages:** Zárraga suffered damage from the false imprisonment, including the loss of his freedom for over three years, physical and psychological injury from the conditions of confinement, lost income and opportunities, and pain and suffering. These damages are sought against all Defendants jointly and severally. Under the law, even those who did not personally handcuff Zárraga are liable if they conspired in or ordered his unlawful detention. The imprisonment of Zárraga was a foreseeable consequence of Defendants' coordinated actions to neutralize him. Thus, each Defendant's conduct was a substantial factor in causing the harm.

137. **Legal Citations (Count VIII):** *Johnson v. Weiner*, 19 So. 2d 699, 701 (Fla. 1944) (definition of false imprisonment; "unlawful restraint of a person against his will"); *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935

170.   Defendants John Does 1–10 – by substitute service or publication if and when their identities become known and with leave of Court.

171.   I will promptly file proof of service or an affidavit detailing efforts and compliance with service requirements once service is completed.

172.   Dated: _____ ___, 2025.

173.   */s/ Guillermo José Zárraga Lázaro*

Guillermo José Zárraga Lázaro, Plaintiff pro se

174.

Nishit Shah
Online Notary Public
Delaware
New Castle
Commission #: 20231211000016
Commission Expires: 2028-01-10

Notarized online using audio-video communication

06/12/2025

So. 2d 1266, 1268 (Fla. 4th DCA 2006) (false imprisonment elements include lack of legal authority or excuse); *Scofield v. Critical Air Medicine, Inc.*, 45 F.3d 436, 441 (11th Cir. 1995) (police who detain without legal process can be liable for false imprisonment); **Restatement (Second) of Torts § 35**; *Wallace v. Kato*, 549 U.S. 384, 389 (2007) (common law false imprisonment consists of detention without legal process).

138. **COUNT IX – Intentional Infliction of Emotional Distress (IIED)**

139. *(By All Plaintiffs Against All Defendants)*

140. Plaintiffs incorporate by reference all preceding paragraphs. This is a claim for **Intentional Infliction of Emotional Distress (IIED)** under Florida common law (or analogous tort principles which are substantially similar in most jurisdictions). The elements are: (1) the defendant's conduct was **intentional or reckless**; (2) the conduct was **extreme and outrageous**; (3) the conduct caused the plaintiff emotional distress; (4) the emotional distress was **severe**. *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985).

141. **Extreme and Outrageous Conduct:** Defendants' conduct as described above is so atrocious and utterly intolerable in a civilized community that it exceeds all bounds of decency. Kidnapping a man from his family at gunpoint, torturing him physically and psychologically, and threatening to harm his loved ones – if that is not "extreme and outrageous," nothing is. The DGCIM

agents literally held a child (A.Z.) at gunpoint and terrorized her; such conduct is **monstrous**. The torture methods inflicted on Zárraga (beatings, suffocation, threats of death and rape) are the stuff of nightmares. Additionally, the prolonged false imprisonment, the smear campaign branding Zárraga a terrorist, and the perversion of the justice system as a tool of persecution – all of that piles on the outrageousness. Courts have found far less egregious acts (like a brief unlawful detention or a single death threat) to potentially qualify as outrageous; here we have a sustained **campaign of terror** against the Plaintiffs. Importantly, Defendants knew Zárraga was innocent of the accusations – tormenting someone they know doesn't deserve it is even more outrageous. In sum, Defendants' conduct epitomizes extreme and outrageous behavior.

142. **Intentional or Reckless:** Defendants intended to cause Plaintiffs emotional distress, or at the very least knew that their actions were certain or highly likely to cause such distress. Indeed, causing mental anguish was one of their goals: they wanted to break Zárraga's spirit and deter others. Holding guns on his wife and daughter was done specifically to inflict emotional pain on him (and on them). The entire scheme – from abduction to torture to threats – was designed to instill terror. Thus, the intent element is satisfied in spades. Even if any Defendant were to claim they didn't intend emotional harm, they acted with **reckless disregard** for the near certainty

of such harm by engaging in this cruelty. There is no question that the distress inflicted was not an unintended side-effect but a deliberate tactic.

143. **Causation of Severe Emotional Distress:** As a direct and proximate result of Defendants' actions, **all Plaintiffs** have suffered severe emotional distress. "Severe" means distress so substantial that no reasonable person could be expected to endure it. Zárraga suffers from classic **post-traumatic stress disorder (PTSD)** symptoms: nightmares about the torture, anxiety attacks, depression, hyper-vigilance, and intrusive memories. He was deeply traumatized by the torture and the helplessness of prolonged captivity. His psychological pain is ongoing and requires professional treatment. Jane Doe likewise experiences severe trauma: she watched armed men take her husband and threaten to kill her and her child; she then spent years fearing he'd be killed, and endured immense emotional turmoil trying to secure his release. She likely has PTSD symptoms as well (flashbacks, insomnia, fear of officials, etc.). A.Z., as a minor victim, undoubtedly has severe emotional scars – having a gun held to her head and seeing her father dragged away is beyond what any child could normally cope with. She likely has nightmares, profound anxiety, and trust issues, and it may affect her development long-term. This distress is not fleeting or mild; it is **profound and life-altering** for each plaintiff.

144. **Third-Party IIED (Bystander Liability):** Under IIED principles, even if one is not the direct target of the outrageous conduct, one can recover if one

was present and the defendant's actions were directed at a close relative. Here, Jane Doe and A.Z. were present for the home raid which was directed at harming Zárraga (their husband/father). Defendants knew the family was present and aimed harm at them too by threats. The agents specifically terrorized Jane Doe and A.Z. to further pressure Zárraga, effectively making the family direct victims as well. Moreover, Zárraga's emotional distress was exacerbated by knowing his family was threatened – Defendants explicitly told him they would harm his loved ones if he didn't comply, thereby using a form of "third-party" torture. Therefore, all Plaintiffs' severe emotional distress is compensable.

145. **No Immunity or Privilege:** There is no applicable privilege or immunity that can shield Defendants from IIED liability here. Governmental authority cannot extend to torture and terror; such acts are outside any discretionary function. To the extent any Defendant claims to have been performing official duties, those acts (torture, threats, unlawful detention) are so clearly illegal and beyond the scope of any legitimate authority that no immunity attaches.

146. **Damages:** Plaintiffs seek compensation for the severe emotional pain and suffering inflicted. This includes costs of therapy and treatment, and an appropriate monetary sum for their psychological anguish, loss of enjoyment of life, and other non-economic damages. Because the conduct was intentional and malicious, Plaintiffs also seek **punitive damages** to punish Defendants and deter such outrageous behavior. Florida law permits punitive damages

for IIED where malice is shown – which is undeniably the case here (Defendants acted with actual malice and specific intent to harm).

147. **Joint and Several Liability:** All Defendants contributed to the emotional distress. Those who physically harmed Zárraga obviously caused distress; those who ordered it or conspired in it are equally liable. The terror inflicted is indivisible. Therefore, each Defendant should be held jointly and severally liable for the full amount of damages for IIED.

148. **Legal Citations (Count IX):** *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277 (Fla. 1985) (adopting IIED elements from Restatement); *Raimi v. Furlong*, 702 So. 2d 1273 (Fla. 3d DCA 1997) (IIED requires extreme outrageous conduct causing severe distress); *Nolin v. Isbell*, 207 F.3d 1253, 1256 (11th Cir. 2000) (explaining "extreme and outrageous" standard); *Lozano v. City of Miami*, 718 F. Supp. 2d 1356, 1366 (S.D. Fla. 2010) (police brutality and threats could state IIED claim); **Restatement (Second) of Torts § 46**.

149. **Prayer for Relief**

150. WHEREFORE, Plaintiffs **Guillermo José Zárraga Lázaro**, demands judgment against Defendants as follows:

151. **Compensatory Damages:** For all actual and compensatory damages in an amount to be determined at trial, including but not limited to damages for personal injury, pain and suffering, mental anguish, loss of liberty, lost income and earnings (past and future), medical and therapeutic expenses,

loss of enjoyment of life, and damage to reputation. Plaintiffs seek such damages jointly and severally from all Defendants, in an amount not less than an amount to be proven at trial (Plaintiffs reserve the right to specify a dollar amount in compliance with procedural rules or court instructions).

152. **Treble and Statutory Damages:** For treble damages as provided by 18 U.S.C. § 1964(c) (Civil RICO) and Fla. Stat. § 772.13 (Florida Anti-Terrorism Act), as applicable, and for any statutory liquidated or enhanced damages available under the Alien Tort Statute or other relevant laws.

153. **Punitive/Exemplary Damages:** An award of **punitive damages** sufficient to punish Defendants for their willful, malicious, and outrageous conduct, and to deter such conduct in the future. Given the egregious nature of Defendants' actions, Plaintiffs seek punitive damages in an amount to be determined by the jury (e.g. several times the compensatory damages, or any other amount the jury deems appropriate).

154. **Attorneys' Fees and Costs:** An award of Plaintiffs' reasonable attorneys' fees and litigation costs, as authorized by statute (including but not limited to the TVPA, RICO, the Florida ATA, and any other applicable law providing for fee-shifting), or, for the pro se Plaintiff, all out-of-pocket legal expenses and

valued time.

155. **Declaratory and Injunctive Relief:** A declaratory judgment that Defendants' actions violated international law, federal law, and state law, and that Plaintiffs were wrongfully imprisoned and tortured in contravention of their rights. Injunctive relief as appropriate, such as an order enjoining Defendants (and anyone acting in concert with them) from harassing or harming Plaintiffs or their family members in the future. Additionally, any orders necessary to attach or restrain Defendants' assets (including PDVSA assets like CITGO shares, to the extent allowed by law) to secure and satisfy a judgment should be issued. While the Court's direct reach over foreign actors is limited, any relief within its power to prevent further harm or to acknowledge the wrong (such as requiring a retraction of defamatory statements, if feasible) is requested.

156. **Pre- and Post-Judgment Interest:** An award of interest as permitted by law on all sums awarded, from the date of each injury or from the date of filing (as the Court deems appropriate), through the date of judgment and continuing thereafter until full satisfaction of the judgment.

157. **Leave to Amend:** An order granting Plaintiffs leave to amend the Complaint as needed to add additional plaintiffs or defendants, or to conform

to evidence that emerges in discovery – including adding claims under other laws if warranted (to ensure all appropriate forms of relief are available, especially if further facts come to light regarding other victims or perpetrators).

158.   **Other Relief:** Any other relief the Court deems just and proper, including equitable remedies such as the imposition of a constructive trust over Defendants' illicit assets located in the United States (to prevent unjust enrichment and facilitate compensation), disgorgement of profits obtained through the wrongful conduct, and any appropriate relief under the Alien Tort Statute or related doctrines.

159.   Plaintiffs respectfully request that this Court enter **judgment in their favor** and against all Defendants, jointly and severally, on all the above Counts, and award the relief requested herein, together with such other and further relief as the Court deems just and proper.

160.   **Jury Demand:** Plaintiffs demand a trial by jury on all issues so triable.

161.   DATED: June ___, 2025.

162.   Respectfully submitted,

163.   */s/ Guillermo José Zárraga Lázaro*

**Guillermo José Zárraga Lázaro**, Plaintiff pro se

Nishit Shah
Online Notary Public
Delaware
New Castle
Commission #: 20231211000016
Commission Expires: 2028-01-10

Notarized online using audio-video communication

06/12/2025

164.

**Certificate of Service**

165.   I hereby certify that on _____, 2025, a true and correct copy of the foregoing Complaint was (or will be) served, together with summonses, on all Defendants in accordance with Rule 4 of the Federal Rules of Civil Procedure. Service has been or will be effected as follows:

166.   Defendant Nicolás Maduro Moros – via international service pursuant to 28 U.S.C. § 1608(a) (through diplomatic channels or other authorized means, as appropriate).

167.   Defendant Iván Hernández Dala – via international service (pursuant to 28 U.S.C. § 1608 or Fed. R. Civ. P. 4(f), as appropriate).

168.   Defendant Tareck Zaidan El Aissami Maddah – via international service (pursuant to applicable provisions).

169.   Defendant PDVSA – by service on the PDVSA Ad Hoc Board's authorized U.S. agent or counsel (or by other method authorized under Rule 4(h) and 28 U.S.C. § 1608(b)).

170.   Defendants John Does 1–10 – by substitute service or publication if and when their identities become known and with leave of Court.

171.   I will promptly file proof of service or an affidavit detailing efforts and compliance with service requirements once service is completed.

172.   Dated: _____ ___, 2025.

173.   */s/ Guillermo José Zárraga Lázaro*

Guillermo José Zárraga Lázaro, Plaintiff pro se

174.

Nishit Shah
Online Notary Public
Delaware
New Castle
Commission #: 20231211000016
Commission Expires: 2028-01-10

Notarized online using audio-video communication

06/12/2025